OLIVE E. QUALLEY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Qualley v. Commissioner
Docket Nos. 6046-73, 6047-73, 6048-73, 6049-73.
United States Tax Court
T.C. Memo 1976-208; 1976 Tax Ct. Memo LEXIS 196; 35 T.C.M. (CCH) 887; T.C.M. (RIA) 760208; June 28, 1976, Filed H. Kent Holman and Larry R. Bemis, for the petitioners. Robert E. Casey and Richard W. Kennedy, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Docket
Taxable Year
Sec. 6651(a) No.
Petitioner
Ended
Deficiency
Addition
6046-73
Olive E. Qualey
12/31/67
$ 37,524.00
12/31/68
9,866.00
12/31/69
29.00
6047-73
Wallace E. Qualey
12/31/67
104,512.00
12/31/68
352,398.00
12/31/69
167,261.00
6048-73
B & C Machine Co., Inc.
3/31/68
290,311.80
$72,577.95
3/31/69
218,154.67
32,723.20
3/31/70
33,619.05
6049-73
Allan S. & Maxine C.
12/31/67
29,850.00
Qualley
12/31/68
10,761.00
12/31/69
41.00
*199 Certain concessions having been made by the parties, the following issues remain for our decision: (1) Whether petitioner B & C Machine Co., Inc. ceased to be a "small business corporation" within the meaning of subchapter S of the Internal Revenue Code of 1954, [2] for the taxable year ended March 31, 1968, and all taxable years thereafter. (2) Whether the claimed theft, bad debt and uninsured losses by petitioner B & C Machine Co., Inc. are allowable. (3) Whether petitioner Wallace E. Qualey received taxable dividends from petitioner B & C Machine Co., Inc. in the form of cash distributions in the amounts of $127,072, $431,997 and $224,503 for the calendar years ended December 31, 1967, December 31, 1968 and December 31, 1969, respectively. (4) Whether petitioner B & C Machine Co., Inc.'s failure to file timely corporate income tax returns for the taxable years ended March 31, 1968 and March 31, 1969 was due to reasonable cause. (5) Whether "discount earned" amounts should be included in petitioner B & C Machine Co., Inc.'s income for the taxable year ended *200 March 31, 1968. (6) Whether B & C Machine Co., Inc. should be allowed to shift $59,566.95 of income from fiscal year 1968 to fiscal year 1969 in order to reconcile differences in its books and records. FINDINGS OF FACT Petitioner B & C Machine Co., Inc. (hereinafter referred to as B & C) MAINTAINED ITS PRINCIPAL PLACE OF BUSINESS IN Hawthorne, California, at the time of filing the petition herein. For the taxable years ended March 31, 1968 and March 31, 1969, B & C filed corporate income tax returns with the Internal Revenue Service Center, Los Angeles, California. The president of B & C signed these returns on December 16, 1968 and September 12, 1969, respectively. The Internal Revenue Service Center received them on December 18, 1968 and September 15, 1969, respectively. These returns were not filed within the period prescribed by law (section 6072(b)), Consequently the respondent determined additions to the tax under section 6651(a) for the taxable years ended March 31, 1968 and March 31, 1969 in the amounts of 25 percent and 15 percent, respectively, of the deficiencies determined for said taxable years. B & C filed a timely corporate income tax return with the Internal *201 Revenue Service Center for the taxable year ended March 31, 1970. B & C filed amended corporate income tax returns with the Internal Revenue Service for the taxable years ended March 31, 1968 and March 31, 1969. Petitioner Wallace E. Qualey maintained his legal residence in Inglewood, California at the time of filing his petition herein. He filed individual income tax returns with the District Director of Internal Revenue, Los Angeles, California, for the calendar years 1967, 1968 and 1969. For those same years he also filed amended individual income tax returns. Wallace E. Qualey filed a second amended individual income tax return for the calendar year 1968. Petitioners Allan S. and Maxine C. Qualley, husband and wife, maintained their legal residence in Long Beach, California at the time of the filing of their petition herein. They filed joint individual income tax returns with the District Director of Internal Revenue, Los Angeles, California, for the calendar years 1967, 1968 and 1969. For the same calendar years they also filed amended individual income tax returns. Petitioner Olive E. Qualley maintained her legal residence in Hawthorne, California at the time of *202 the filing of the petition herein. She filed individual income tax returns and amended individual income tax returns with the District Director of Internal Revenue, Los Angeles, California, for the calendar years 1967, 1968 and 1969. Petitioners Wallace E. Qualey, Allan S. Qualley and Olive E. Qualley are brothers and sister, [3] and each owned 1/3 of the outstanding stock of B & C during the years material herein. From April 1, 1959 through the taxable year ended March 31, 1967, B & C was a "small business corporation" within the meaning of the applicable provisions of the Code. It was a machine shop primarily serving customers in the aerospace industry. Wallace E. Qualey (hereinafter referred to as Qualey) was president of B & C. He was responsible for and controlled the day-to-day management of B & C. At all times material herein, J. D. McKernie (hereinafter referred to as McKernie) owned and operated an accounting business located at 1422 E. Artesia Boulevard, Long Beach, California, which business was known and referred to as J. D. *203 McKernie" & Associates. Petitioners did not call McKernie to testify during the trial of these cases. At some point during the first two months of 1967, Qualey, president of B & C, hired McKernie to prepare monthly profit and loss statements and balance sheets for B & C. He agreed to pay McKernie $250 per month for performing these services. On October 26, 1967, a "Certificate of Corporation for Transaction of Business Under Fictitious Name" was filed with the County Recorder of Los Angeles County. The certificate recites that a corporation named Amity Investment Corporation with a principal place of business at 1422 E. Artesia Boulevard, Long Beach, is conducting a "purchase parts sales business located at 1422 E. Artesia Blvd. in Long Beach, California, under the fictitious firm name of B & C Machine Co." (For purposes of convenience only, "Amity Investment Corp. dba B & C Machine Co." will hereinafter be referred to as Amity.) This certificate reflects that it was signed on September 1, 1967, by McKernie as secretary of Amity. At some point beginning in early October of 1967, Qualey and McKernie had several discussions relative to Amity. On November 7, 1967, Qualey, McKernie *204 and McKernie's daughter Sharon Powers (hereinafter referred to as Powers) had a meeting during which they agreed that Qualey and Powers would serve as president and secretary, respectively, of Amity. Qualey and McKernie agreed that McKernie would maintain and keep physical possession and control of the books and records of Amity. These books and records were to be kept at McKernie's office. They did not discuss compensation for services to be allegedly rendered to Amity by Qualey, Powers or McKernie. On that same day they opened a commercial bank account at Home Bank, Paramount, California, under the name of "Amity Investment Corp. dba B & C Machine Co., Inc." (hereinafter this bank account is referred to as the Amity account). Qualey agreed with McKernie to place B & C funds in the Amity bank account, and they decided to use the Amity account "as a vehicle for Mr. McKernie to invest funds." The bank signature card, dated November 7, 1967, for the Amity account recites that the kind of business engaged in was machine parts and that the address was at 1422 E. Artesia, Long Beach. This signature card was signed by Qualey and Powers as president and secretary, respectively, of *205 Amity. The checks printed for this account maintained at Home Bank bear the following name and address in the upper left hand corner: B & C Machine Company 1422 East Artesia Blvd. Long Beach, California
The "Certificate of Corporation for Transaction of Business Under Fictitious Name," the bank signature card and the printed checks for the Amity account all bear the business address of J. D. McKernie & Associates. B & C maintained its checking account at Security First National Bank (which later changed its name to Security Pacific National Bank). (This bank is hereinafter referred to as the Security Bank and this account as the B & C Secuity Bank Account). It was never a depositor nor did it maintain a checking account at Home Bank. B & C never disbursed any funds for the acquisition of any stock of Amity. The books, records and corporate income tax returns of B & C reflect no ownership by B & C of Amity. At all times material herein, B & C performed services under separate United States Government Contracts (hereinafter collectively referred to as government contracts), for Nortronics Anaheim (hereinafter referred to as Nortronics), Hill Air Force Base (hereinafter *206 referred to as HAFB) and McClellan Air Force Base (hereinafter referred to as MAFB). These contracts were subject to the provisions of the Renegotiation Act of 1951, as amended. However, both the original and the amended corporate income tax returns filed by B & C for the taxable years ended March 31, 1968 and March 31, 1969, recite that during said taxable years, B & C did not have any contracts or subcontracts subject to the Renegotiation Act of 1951. About the time of the opening of the Amity account at Home Bank in November of 1967, Qualey and McKernie had discussions concerning B & C's position relative to the filing of reports with the Renegotiation Board. During the years in issue B & C did not file a report with the Renegotiation Board; however, if the payments received by B & C from Nortronics, HAFB and MAFB had been reported on the books and records of B & C, B & C would have had to file a report with the Renegotiation Board. B & C presently has a case pending before the Renegotiation Board for the period ended March 31, 1968. The payments received by B & C from Nortronics, HAFB and MAFB were deposited in the Amity account pursuant to an agreement between Qualey *207 and McKernie. Either Qualey or someone acting on his behalf or under his directions forwarded these payments to McKernie's office for deposit into the Amity account. These checks received by B & C as payments for services rendered by B & C under these government contracts were not deposited in the B & C account maintained at Security Bank nor were the payments recorded on the books and records of B & C. All the shareholders of B & C knew that the checks were being deposited in the Amity account and that the checks were not being recorded on the books and records of B & C. Qualey exercised dominion and control over the B & C checks received from Nortronics, HAFB and MAFB. Other than these payments from B & C, Qualey did not personally contribute any funds to Amity. However, McKernie may have contributed funds to Amity. On its original corporate income tax returns filed for the taxable years ended March 31, 1968 and March 31, 1969, B & C did not report these payments as income; however, B & C claimed as deductions expenses associated with its performance of services under these contracts. Nor did Qualey on his original income tax returns filed for the taxable years ended *208 December 31, 1967, December 31, 1968, and December 31, 1969, report as income any of the funds he diverted from B & C to the Amity account. Qualey "authorized" Powers to make disbursements from the Amity account. Qualey normally telephoned Powers in order to give her the "authorization" to make disbursements. She would then write a check for the amount "authorized." Qualey did not keep a record of the disbursements he "authorized" her to make from the Amity account. Several of the disbursements from the Amity account were used for the direct personal pecuniary benefit of Qualey, while none of the disbursements from the Amity account were used for the benefit of B & C. Qualey, as president of B & C, authorized McKernie to purchase for B & C a corporation known and referred to as Scalex Corporation (hereinafter referred to as Scalex). Qualey had earlier instructed J. D. McKernie to look for a potential loss corporation that might be purchased by B & C. On March 20, 1968, a check was drawn on the B & C Security Bank Account in the amount of $40,000 and made payable to J. D. McKernie & Associates. Qualey signed this check for the purchase of Scalex. The corporate income tax *209 returns of B & C filed for the taxable years ended March 31, 1968 and March 31, 1969, state that B & C owned 100 percent of the stock of Scalex. B & C obtained a previously made promissory note as part of the acquisition of Scalex. The note obligated Scalex to attorney Alfred A. Calabro (hereinafter referred to as Calabro) in the amount of $49,088.63. On March 20, 1968, Qualey signed and endorsed a check made payable to himself in the amount of $49,088.63. He drew it on the B & C Secuirty Bank Account. The check represented payment by B & C to Qualey for the face amount of the above-mentioned Scalex promissory note. It allegedly represented a "bonus" to him from B & C. There is no credible testimony in the record evidencing why B & C should have made said alleged "bonus" payment to Qualey. On his original income tax return filed for the taxable year ended December 31, 1968, Qualey did not report this bonus as income. At the time McKernie acquired Scalex for and on behalf of B & C, McKernie received all of the books and records of Scalex. Qualey and McKernie agreed that McKernie would keep physical control and possession of the books and records of Scalex. Scalex, during *210 the times material herein, operated a machine shop business under the fictitious name of LaVerne Production Engineering in a building located in LaVerne, California. In July of 1969, LaVerne Production Engineering ceased doing business. In the spring of 1969 Qualey had purchased the building in which LaVerne Production Engineering was located with a check drawn on his personal account for $80,000. The check was made out to McKernie. Qualey, as president of B & C, authorized McKernie to purchase for B & C a corporation known and referred to as American National Rent-A-Car or ANRAC (hereinafter referred to as ANRAC). On July 10, 1968, Qualey drew a check on the B & C Security Bank Account in the amount of $100,000 and made it payable to J. D. McKernie. This check was for the purchase of ANRAC. The corporate income tax returns of B & C filed for the taxable years ended March 31, 1968 and March 31, 1969, state that B & C owned 100 percent of the stock of ANRAC. B & C obtained a promissory note as part of the acquisition of ANRAC. On March 3, 1969, Qualey drew and endorsed a check to himself on the B & C Security Bank Account in the amount of $85,112.24. This check represented *211 the payment by B & C to Qualey for the promissory note.This $85,112.24 payment allegedly represented another "gift" or "bonus" to Qualey from B & C. Again there is no credible explanation in the record evidencing why B & C should have made the alleged "gift" or "bonus" payment to Qualey. On his original income tax return filed for the taxable year ended December 31, 1969, Qualey did not report as income the $85,112.24 received by him from B & C as an alleged "bonus" or "gift." McKernie kept physical possession and control of what books and records were received from ANRAC pursuant to the acquisition of ANRAC for and on behalf of B & C. At some point in August or September of 1969, Qualey received from McKernie, at McKernie's office, three cardboard boxes (approximately 15 to 18 inches cubed) containing various books and records of Scalex and ANRAC. After receipt, Qualey took the boxes and the books and records contained therein to B & C; he did not inventory the contents of the boxes. At the time of trial, Qualey was unable to recall who had maintained physical custody and control of the books and records that were received in the boxes between the time of receipt from McKernie *212 and the time of trial. Also, at the time of trial, Qualey was unable to identify what books and records were contained in the boxes when they were received from McKernie. Not later than October of 1969, B & C was aware that the Internal Revenue Service proposed to terminate the "small business corporation" status of B & C. There was no bank deposits analysis prepared and submitted by petitioners with reference to the Amity account nor is there anything in the record evidencing the source of all funds deposited in the Amity account during the years in issue herein. On May 25, 1970, B & C, as plaintiff, filed suit against Joseph D. McKernie, J. D. McKernie & Associates, Doris Jane McKernie, Sharon Powers, J. D. Productions, Alfred Calabro, Amity Investment Corporation and other unspecified defendants in the Superior Court of California for the County of Los Angeles (Superior Court Docket No. 977669). Therein, B & C, in substance, prayed for recovery of certain sums of money allegedly received by defendants from B & C subsequent to the time of deposit of those monies in the Amity account. After trial in this case judgment was entered in favor of B & C pursuant to a settlement *213 agreement in the above-named proceedings. On May 25, 1970, B & C, as plaintiff, filed suit against Alfred Calabro, Anthony J. Calabro, Edward H. Calabro, Daniel F. Calabro and the Calabro law partnership in the Superior Court of California for the County of Los Angeles (Superior Court Docket No. 977668). Therein, B & C, in substance, prayed for recovery of certain amounts of money allegedly received by defendants subsequent to the time these amounts were allegedly deposited into the Amity account. After trial in this case judgment was entered in favor of B & C pursuant to a settlement agreement in the above-named proceedings. B & C has not filed any actions against Qualey relative to his involvement in matters relating to Amity, the Amity account, Scalex or ANRAC. There were no criminal complaints filed against Qualey, McKernie, Powers, Calabro or Home Bank in connection with their involvement in actions relating to Amity, the Amity account, Scalex or ANRAC. In the statutory notice of deficiency issued to B & C, the respondent, in adjustment (g) entitled "Discounts Earned," increased B & C's taxable income for the taxable year ended March 31, 1968 in the amount of $947.02. *214 In the statutory notice of deficiency issued to B & C, the respondent, in adjustment (i) entitled "Interest Income," increased B & C's taxable income for the taxable year ended March 31, 1968 in the amount of $2,318.56. In the petition filed by B & C, B & C does not allege any error on the part of the respondent or specifically plead any facts with respect to either adjustment (g) or (i), as set forth in the statutory notice of deficiency for the taxable year ended March 31, 1968. OPINION Issue 1. Whether petitioner B & C Machine Co., Inc. ceased to be a "small business corporation" within the meaning of subchapter S of the Internal Revenue Code of 1954 for the taxable year ended March 31, 1968, and all taxable years thereafter.
Subchapter S permits a qualified corporation to make an election under which its income and losses are taken into account on the individual income tax returns of its shareholders, thus avoiding the double tax normally paid when a corporation distributes its earnings and profits as dividends. John E. Byrne,45 T.C. 151 (1965). However, *215 in order to be eligible to make such an election, a corporation must satisfy all of the statutory requirements set forth in section 1371 and continue to satisfy them after the elction is made. The election will be terminated automatically as of the beginning of the taxable year in which such requirements are no longer satisfied. Section 1372(e)(3). On March 20, 1968, Wallace E. Qualey, president of B & C, drew a check on B & C's Security Bank Account in the amount of $40,000 payable to J. D. McKernie & Associates for the purpose of purchasing the Scalex Corporation. On July 10, 1968 Qualey drew another check on B & C's Security Bank Account in the amount of $100,000 payable to J. D. McKernie, for the purpose of purchasing the corporation American National Rent-A-Car (ANRAC). McKernie and Qualey agreed that McKernie would keep the books and records of Scalex and ANRAC. On B & C's corporate income tax returns for the years ended March 31, 1968 and March 31, 1969, Scalex and ANRAC were reported as 100 percent owned by B & C. J. D. McKernie's accounting firm prepared the returns and Qualey signed them as president of B & C. On the returns losses of ANRAC were used to diminish *216 the income of B & C. Scalex operated a machine shop under a fictitious name known as LaVerne Production Engineering. In the spring of 1969 Qualey purchased with his own funds the building in which LaVerne Production Engineering was housed. Later he transferred the building to B & C which eventually sold it.
In pertinent part, section 1371(a) reads: "For purposes of this subchapter, the term 'small business corporation' means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) * * *." Section 1504 defines "affiliated group" and "includible corporation." Pertinent parts of that section are quoted below: (a) * * * As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if-- (1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) *217 is owned directly by one or more of the other includible corporations; and (2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations. * * *
(b) Definition of "Includible Corporation".-- As used in this chapter, the term "includible corporation" means any corporation except-- (1) Corporations exempt from taxation under section 501. (2) Insurance companies subject to taxation under section 802 or 821. (3) Foreign corporations. (4) Corporations entitled to the benefits of section 931, by reason of receiving a large percentage of their income from sources within possessions of the United States. (5) Corporations organized under the China Trade Act, 1922. (6) Regulated investment companies and real estate investment trusts subject to tax under subchapter M of chapter 1. (7) A DISC or former DISC (as defined in section 992(a)).
Section 1372(e)(3), referring to the termination of small *218 business corporation status, states: An election under subsection (a) made by a small business corporation shall terminate if at any time-- (A) after the first day of the first taxable year of the corporation for which the election is effective, if such election is made on or before such first day or (B) after the day on which the election is made, if such election is made after such first day, the corporation ceases to be a small business corporation (as defined in section 1371(a)). * * *
Section 1.1371-1(c), Income Tax Regs., provides, with exceptions not here material, that a corporation which is a member of an affiliated group of corporations, as defined in section 1504, is not a "small business corporation," whether or not such an affiliated group has ever filed a consolidated return. Petitioners' first argument is that B & C was not a member of an affiliated group because B & C received nothing of value nor any benefit for the sums paid to McKernie; therefore, it did not acquire anything. They make this argument on the grounds that McKernie dealt fraudulently with B & C, in that he made a large profit on the transactions, in that *219 B & C received no books, records or shares and in that McKernie failed to discuss the subchapter S implications of such purchases. We find no support for this argument in the record other than Qualey's self-serving testimony. Qualey drew checks totaling $140,000 for the purchase of these corporations, McKernie acquired them for B & C, and B & C listed them on its corporate income tax returns. Scalex actively operated a machine shop after it was purchased. Furthermore, there is no credible testimony in the record that ANRAC did not also carry on business after its purchase by B & C. One of ANRAC's former shareholders testified that at the time its stock was purchased ANRAC had accounts receivable in the amount of $100,000. We cannot make a determination that B & C received nothing of value or that there was no benefit in purchasing the corporation. Petitioners make their second argument of nonaffiliation in this manner. A portion of the legislative history of subchapter S states that "[these] corporations must be domestic corporations which are not eligible to file a consolidated return with any other corporation." [4] B & C was not eligible to file consolidated returns *220 during its ownership of ANRAC and Scalex, Therefore, B & C did not jeopardize its subchapter S status. B & C claims it was not eligible to file consolidated returns because it had no business purpose in purchasing ANRAC and Scalex; B & C asserts it purchased them solely for the purpose of reducing taxes. B & C then looks to cases which have stated that although a corporation may be a member of an affiliated group, it may be denied such status for purposes of filing consolidated returns if there was no business purpose behind the acquisitions and the principal purpose of the acquisitions was to avoid taxes. [5]
We have two problems with petitioners' argument. *221 First, we are of the opinion that the steps in petitioners' syllogism do not necessarily lead to the proffered conclusion, and second, we conclude that petitioners' have not met their burden of proving that B & C purchased Scalex and ANRAC principally for tax reduction motives. In support of its postulate that B & C was not eligible to file consolidated returns, petitioners point to the respondent's disallowance of ANRAC's losses on B & C's returns. This they assert supports their contention that ANRAC and Scalex were purchased solely for reducing taxes, (No losses of Scalex were taken on B & C's return despite Qualey's testimony that Scalex was purchased for its alleged $200,000 loss carry forward.) No mention is made in the statutory notice that the losses were disallowed because there was "no business purpose" or because B & C was "not eligible to file a consolidated return." Nor is there any mention of section 269 in the statutory notice despite petitioners' contention that the losses were disallowed under this section. [6] All we have is Qualey's testimony that B & C purchased the corporations solely for their tax losses. Petitioners offered no credible explanation for the *222 fact that no losses of Scalex appeared on B & C's tax returns or that Scalex as LaVerne Production Engineering was still in operation two years after its purchase. Qualey insisted at trial that he wrote the checks for the corporations pursuant to the direction of his accountant McKernie and that McKernie recommended purchase of tax loss corporations for the purpose of diminishing B & C's income taxes. Petitioners, however, failed to call their accountant as a witness. This can only give rise to the inference that any proof, if offered, would have been unfavorable to petitioners' argument. Interstate Circuit v. United States,306 U.S. 208 (1939); Wichita Terminal Elevator Co.,6 T.C. 1158, 1165 (1946), affd, 162 F.2d 513 (10th Cir. 1947). Section 1371(a) excludes a member of an affiliated group from being a small business *223 corporation. This section in turn points to section 1504 for the definition of affiliated. Reading the statute leads us to the conclusion that B & C, as owner of 100 percent of Scalex and ANRAC, was "affiliated" for purposes of section 1371(a). "The statute prescribes no test of affiliation other than stock wonership." John Fox,T.C. Memo. 1958-205. The purchase of 100 percent of the stock of two apparently active concerns jeopardized B & C's status as a small business corporation. Coca Cola Bottling Co. of Gallup v. United States,443 F.2d 1253 (10th Cir. 1971); Barnes Motor & Parts Co. v. United States,309 F. Supp. 298 (E.D. N.C. 1970). Issue 2. Whether the claimed theft, bad debt and uninsured losses by petitioner B & C Machine Co., Inc. are allowable.
On its amended corporate income tax return filed for the taxable year ended March 31, 1969, and on its original corporate income tax return filed for the taxable year ended March 31, 1970, petitioner B & C Machine Co., Inc. claimed theft losses of $478,076.25 and $133,222.12, respectively. B & C apparently makes its claims on the grounds that its accountant J. D. *224 McKernie fraudulently induced B & C to establish a separate account for "investments" and fraudulently induced B & C to purchase "loss corporations" from him. Respondent questions whether a theft actually occurred, whether it is possible to determine from the evidence offered at trial the value of the "stolen" property, whether B & C is even the proper entity to claim part of the loss, and whether in the year claimed there was a reasonable possibility of recovering the "stolen" property.
The burden is, of course, on petitioner B & C to prove that the funds represented by the claimed theft losses were, in fact, the subjects of a theft. Arcade Realty Co.,35 T.C. 256 (1960). Although we are inclined to believe "that the evidence in the record creates a suspicion of defalcations and may be a significant link in a possible chain of facts" [7] we, nevertheless, conclude that B & C has not established all the elements of either a theft or embezzlement under local law. Michele Monteleone,34 T.C. 688 (1960). *225 Section 165 states: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(e) Theft losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. Section 1.165-8(d), Income Tax Regs., defines the term "theft" as including, but not necessarily limited to larceny, embezzlement, and robbery. To support its theft loss claims B & C relies solely on the testimony of Qualey at trial and on "facts" found in state court judgments entered in its favor against J. D. McKernie and Alfred Calabro. Not only do we have difficulty with Qualey's testimony in that it was confusing, contradictory and at times evasive but, we are also unwilling to go beyond taking judicial notice of the fact that judgments were rendered in those two state court cases. [8] This Court is not bound by the alleged "facts" found in those cases. Commissioner v. Estate of Bosch,387 U.S. 456 (1967). *226 During the taxable years here in issue, B & C performed services for the United States Government under contracts subject to the Renegotiation Act of 1951. Payments on these contracts were made by checks payable to B & C. During this time period, Qualey placed these checks worth several hundred thousand dollars in a bank account where he and McKernie's daughter had signature privileges. This account was separate from the corporation's regular account. The bank account which Qualey employed was the "Amity Investment Corp. dba B & C Machine Co., Inc." checking account at Home Bank (Amity account). No part of the monies was reported to the Renegotiation Board and no part of the monies was reported as income on the corporate income tax returns of B & C. Petitioners claim that B & C "was induced by J. D. McKernie, supposedly for good business reasons, to transfer" the receivables to the Amity account. They then state that "J. D. McKernie * * * without the knowledge or consent of W. E. Qualey or any officer of B & C * * * appropriated or caused to be appropriated *227 to his own personal use at least $578,242.09 from that account." The theft loss from the Amity account is based on checks which Qualey states he did not authorize. At trial Qualey went through the checks written on the account and testified as to which checks he remembered authorizing and to which he did not. During the years in which the checks were written Qualey neither kept a record of those he authorized nor saw the monthly bank statement. Qualey asserts the "unauthorized" checks were written for McKernie's personal benefit. On Qualey's testimony alone we are unable to determine that a theft occurred under California law. Qualey's testimony consists basically of accusations against McKernie; yet, neither McKernie nor his daughter were present at trial to answer the often contradictory accusations of Qualey. Consequently, we cannot conclude that their testimony would have been supportive of B & C's contentions. Wichita Terminal Elevator Co.,6 T.C. 1158 (1946), 162 F.2d 513 (10th Cir. 1947). Furthermore, we also take note of the fact that the record is silent as to the commencement of any criminal proceedings against anyone relative to the purported *228 theft. We are in agreement with respondent that the lack of commencement of any such criminal proceedings tends to cast doubt on the reality of the alleged theft or embezzlement. Arcade,supra.
Petitioner places a great deal of emphasis on Michelle Monteleone,34 T.C. 688 (1960), in which the alleged thief testified at the Tax Court trial and admitted, in effect, that he had taken money from Monteleone under false pretenses. There was a settlement pursuant to a civil suit but no criminal proceedings ensued. Nonetheless, this Court allowed the theft loss. In the instant case there is almost a total lack of proof that distinguishes it from Monteleone; furthermore, the cases are factually dissimilar. B & C [9] has further failed to show that the monetary amount of the alleged theft loss is the same as the amount claimed. Petitioners apparently depend on exhibits which were not admitted into evidence for the purpose of proving the truth of the matters asserted therein. There is no proof of the amount "lost." Petitioners *229 have further failed to show that there was no reasonable prospect of recovery during the years at issue herein. They have alleged that McKernie has no assets but they base that on an investigation of no more than two or three hours. They have also failed to show the uncollectibility of their California civil suits. Since they have not shown either lack of success in their lawsuits or uncollectibility of judgments arising out of those lawsuits, petitioners have failed to show the lack of reasonable prospects of recovery. Unfortunately, petitioners have similarly failed to sustain their alternate arguments. Petitioners assert a loss under section 165(a). This argument merely assumes that the claimed "losses" constitute losses under section 165(a), but does not offer any evidence in support of this proposition. Again, B & C has not established that a "loss" has occurred. Petitioners also make a bad debt loss argument. Fatal to petitioners' argument is the absence of a showing of a "debt." Lacking a "debt" petitioners may not claim a bad debt loss. Furthermore, they have failed to show when the debt became worthless. Petitioners make a final argument of a worthless stock *230 loss. They argue that B & C is entitled to deduct, under section 165(g), as a worthless security of an affiliated corporation, the $140,000 which B & C paid for Scalex and ANRAC. However, we cannot find enough supporting evidence to allow this deduction. There was never any showing of exactly what type of income Scalex and ANRAC had in order to meet the requirements of section 165(g). Also, petitioners argued at trial that Scalex and ANRAC never had any income; that the only "worth" of Scalex and ANRAC was the potential for utilization of the losses which they incurred. But Scalex was operated as a machine shop and was obviously not "worthless." Furthermore, we are unable to determine when the corporations became worthless. Issue 3. Whether petitioner Wallace E. Qualey received taxable dividends from petitioner B & C Machine Co., Inc. in the form of cash distributions in the amounts of $127,072, $431,997 and $224,503 for the calendar years ended December 31, 1967, December 31, 1968 and December 31, 1969, respectively. Respondent determined that Qualey received actual and constructive dividends in the amounts of $127,072, $431,997, and $224,503 for the calendar years 1967, *231 1968 and 1969. Respondent based the total amount of the cash distributions from B & C to Qualey in 1967 on the sum of the following: $ 92,072
Funds originally belonging to B & C
and then deposited by Qualey or his
agent in the Amity account
35,000
Other cash distributions to Qualey
$127,072
Total
Respondent based the total amount of the cash distributions from B & C to Qualey in 1968 on the sum of the following: $367,908
Funds originally belonging to B & C
and then deposited by Qualey or his
agent in the Amity account
49,089
Scalex promissory note "bonus"
15,000
Other cash distributions to Qualey
$431,997
Total
Respondent based the total amount of the cash distributions from B & C to Qualey in 1969 on the sum of the following: $104,586
Funds originally belonging to B & C
and then deposited by Qualey or his
agent in the Amity account
85,112
ANRAC promissory note "bonus"
34,805
Other cash distributions to Qualey
$224,503
Total
In their opening brief petitioners, for the first time, assert that they are confused by respondent's computations. Frankly, we are also puzzled at the origin of some *232 of respondent's figures and distressed with petitioners for not clearing up their confusion at trial. Nonetheless, petitioners have the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure. Therefore we conclude that any sums not specifically conceded or challenged, petitioner Qualey has conceded as a correct determination by respondent. Petitioner Qualey concedes that he actually received but did not report certain sums from B & C. These sums include the following for 1968: a check for $35,000 written on the Amity account purportedly for the purchase of a condominium from W. E. Qualey and a check for $49,088.63 written on the B & C Security Bank Account purportedly as a bonus on the purchase of Scalex corporation and the assumption of its note in the same amount. The concessions for 1969 include: a check written on the Amity account in the amount of $220.04 for a trip to Hawaii, a check on the Amity account in the amount of $647.75 for personal jewelry, a check on the Amity account in the amount of $400 for jewelry, a check on the Amity account in the amount of $13,000 to close out the account, an additional check on the account in the amount of $577.24 to *233 close out the account, and a check written on B & C's Security Bank Account in the amount of $85,112.24 as a "bonus" on the acquisition of ANRAC and the assumption of its notes in the same amount. As for the remaining amounts, petitioner Qualey asserts that they cannot be classified as constructive dividends because they did not benefit him, instead these amounts, deposited in the Amity account, benefitted J. D. McKernie. Respondent, on the other hand, asserts that the account was set up by Qualey for the purpose of avoiding renegotiation of some of B & C's government contracts and also for the purpose of diminishing B & C's income taxes. Respondent points to the boom in the aerospace industry at this time, a boom of which B & C apparently was a beneficial recipient. Respondent then concludes that in order to avoid compulaory renegotiation of B & C's government contracts under the Renegotiation Act of 1951 (and thereby reducing B & C's income), Qualey decided to divert from B & C, incoming payments on certain government contracts.
The fact that these payments were never reflected on the books and records of B & C, nor on B & C's original income tax returns (while the costs of *234 performance under these contracts were recorded on B & C's books and deducted on B & C's tax returns) tends to support respondent's interpretation. Petitioner's response to respondent's assertions is that McKernie duped Qualey into setting up the account and then took the money for his own use. As we have previously stated, petitioner's accusations against MKernie are not sufficient to support a finding that McKernie fraudulently dealt with Qualey or B & C's funds. We have only Qualey's actions in terms of these funds on which to base our conclusions. Qualey had checks pertaining to the government contracts delivered to McKernie who would then deposit them in the Amity Investment Corp. dba B & C Machine Co., Inc. bank account (Amity account) at Home Bank. Checks drawn on the account were to be drawn only by Qualey's order. Qualey testified at trial that he would phone McKernie's daughter and "authorize" her to make disbursements from the Amity account and that she would then write a check for the amount. Qualey admitted that many of the checks written on the Amity account were for his personal and pecuniary benefit. Furthermore, he knew that the checks deposited in the *235 account were not being recorded on the books and records of B & C. Finally, there is no evidence that any of the disbursements were used for the benefit of B & C. Again we are in agreement with respondent that it is the dominion and control Qualey exercised over the funds originally belonging to B & C and which ended up in an account controlled by him that determines whether or not he received constructive dividends. The control of property and enjoyment of its benefits is a proper basis for taxation. Section 61(a) defines gross income as including income from whatever source derived, including dividends. Section 316 (a) defines dividends as including any distribution of property made by a corporation to its shareholders out of earnings and profits. Section 301(c) states that a dividend shall be included in gross income. There is no question in this case but that B & C had adequate earnings and profits in the years in question to pay the dividends. The distribution need not be formally declared *236 as a dividend by the corporation. The motive or expressed intent of the corporation is not determinative. Commissioner v. Riss,374 F.2d 161 (8th Cir. 1967). Constructive dividends have been found contrary to the expressed intent of a corporation. Sachs v. Commissioner,277 F.2d 879 (8th Cir. 1960). There is no requirement that the distribution be pro rata among the shareholders or even that all shareholders participate in receiving a distribution. Simon v. Commissioner,248 F.2d 869 (8th Cir. 1957); Lengsfield v. Commissioner,241 F.2d 508, 511 (5th Cir. 1957). Where controlling stockholders divert corporate income to themselves, it is proper to regard such diverted funds as constructive dividends for tax purposes. Jack M. Chesbro,21 T.C. 123 (1953), affd. 225 F.2d 674 (2d Cir. 1955); Currier v. United States,166 F.2d 346 (1st Cir. 1948); Dawkins v. Commissioner,238 F.2d 174 (8th Cir. 1956). Neither does the dividend escape taxation simply because it fails to pass through the hands of the particular taxpayer when, as in the instant *237 case, the dividend is diverted at the behest of the shareholder into the hands of others. Biltmore Homes, Inc. v. Commissioner,288 F.2d 336 (4th Cir. 1961), affirming a Memorandum Opinion of this Court, cert. den. 368 U.S. 825 (1961); Sammons v. United States,433 F.2d 728 (5th Cir. 1970), cert. den. 402 U.S. 945 (1971). The shareholder is taxable on the distribution of corporate earnings made at his demand or request to a third person for some purpose which he wished to serve, although he, himself, received no direct economic gain. See Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963); Byers v. Commissioner,199 F.2d 273 (8th Cir. 1952). These cases are based upon the assignment of income principle enunciated in Helvering v. Horst,311 U.S. 112, 116-117 (1940), where it was explained that income is realized by assignor when he "who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." The crucial *238 question here is whether Qualey obtained sufficient power and control over the diverted property or over receipt of the diverted property to make it reasonable to treat him as the recipient of the income for tax purposes. See Commissioner v. Sunnen,333 U.S. 591 (1948). The question must be answered in the affirmative. The payments to B & C were diverted at the direction and control of Qualey to a bank account established by Qualey. The checks drawn on this bank account were to be authorized by Qualey. Either Qualey or his authorized agent was to--and actually did--sign checks on this account. The control exercised by Qualey was complete. It is of little consequence that he allegedly personally received a relatively small return on the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received. Helvering v. Horst,supra;Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972); Floyd v. Scofield,193 F.2d 594 (5th Cir. 1952). Petitioners' "economic benefit" argument is basically that the arithmetic total of the checks allegedly *239 "authorized" by Qualey to be written on the Amity account was less than the arithmetic total of monies diverted by Qualey from B & C to the Amity account.Even assuming, arguendo, that petitioners could show that the numbers or amounts of particular checks on the Amity account bore any relation to the numbers or amounts of particular deposits in the Amity account, such a showing would be immaterial. It is not Qualey's later receipt of a particular Amity check that constitutes a constructive dividend to him, but the placing of funds originally belonging to B & C in a bank account over which he had full and complete control.
Petitioners also put forth arguments dealing with parent-subsidiary corporations and brother-sister corporations. Such arguments are inapposite to this case, however, inasmuch as there has been no showing that Amity and B & C are in any way related. In fact, there has been no showing of the exact status of Amity. Apparently, Amity was merely a bank account; thus, no parent-subsidiary or brother-sister corporation rules would apply. Basically, the question of constructive dividends in this case is a factual question. The individual petitioner, Qualey, owned *240 a portion of and controlled B & C, the corporate petitioner. During the taxable years involved, Qualey took several hundred thousand dollars in checks from the corporation's incoming mail basket. He deposited these checks in a bank account over which he had complete control. He thus caused the corporate income to be understated by the amount of the withdrawals, and no part of the amounts so received was reported on his individual income tax return. This Court has held time and again under circumstances similar to those here present that the diverted funds are taxable as income to the corporation and are taxable dividends to the extent of earnings and profits to the officer-stockholder receiving them. See, e.g., United Mercantile Agencies, Inc.,23 T.C. 1105 (1955), reversed and remanded on another issue sub nom. Drybrough v. Commissioner,238 F.2d 735 (6th Cir. 1956). Issue 4. Whether petitioner B & C Machine Co., Inc.'s failure to file timely corporate income tax returns for the taxable years ended March 31, 1968 and March 31, 1969, was due *241 to reasonable cause.
For the taxable years ended March 31, 1968 and March 31, 1969, B & C filed corporate income tax returns which the Internal Revenue Service received on December 18, 1968 and September 15, 1969, respectively. B & C requested no extensions of time for filing these returns; therefore, they were not filed within the period prescribed by section 6072(b). In the statutory notice of deficiency issued to B & C, respondent determined additions to the tax under section 6651(a) for the taxable years ended March 31, 1968 and March 31, 1969, in the amounts of $72,577,95 and $32,723.20, respectively. These amounts are 25 percent and 15 percent, respectively, of the deficiencies determined for the taxable years. Petitioner B & C contends that the penalty is not applicable because its failure to timely file income tax returns was due to reasonable cause and not to willful neglect. Qualey testified that he relied on J.D. McKernie to file B & C's returns on a timely basis, and that he made numerous inquiries about the returns and asked whether or not McKernie had timely filed them. He testified further that McKernie assured him that the entire matter was under control. *242 The alleged reliance of a petitioner upon an accountant to prepare and file tax returns is a frequently heard defense in section 6651 cases. In such cases we have consistently held that a "petitioner cannot, upon a bare showing of reliance upon [an] accountant, establish the requisite reasonable cause and thereby shield [itself] from liability for the additions to tax * * * sought to be imposed." Jane U. Elliott,40 T.C. 304, 315 (1963); see also Paula Construction Co.,58 T.C. 1055 (1972). Since all we are offered is Qualey's rather remarkable testimony as to his "reliance" upon McKernie, B & C's position cannot be sustained. Other than Qualey's self-serving testimony we do not know the reason why McKernie failed to prepare the returns in sufficient time for petitioner to file them when due. As for Qualey's "constant inquires" we find them inconsistent with his "full confidence" and "complete reliance" on McKernie. Did he suspect McKernie and if so why did he abdicate his responsibility to file timely returns? He failed to act as an ordinary, *243 intelligent and prudent businessman by blindly acquiescing in all of McKernie's (alleged) decisions and thereby giving McKernie effective control of the filing of returns, whereas the responsibility was basically his own. As for the cases cited by petitioners, we find them inapposite to this case. All the cited cases deal with whether a return is to be filed not when it is to be filed. Also in those cases the courts made a finding that the parties acted as reasonable taxpayers would. Here we are unable to do so. Issue 5. Whether "discount earned" amounts should be included in petitioner B & C Machine Co., Inc.'s income for the taxable year ended March 31, 1968.
Adjustment (g) on the statutory notice to B & C for the taxable year ended March 31, 1968, included in the income of B & C certain unreported discounts. Adjustment (i) on the same notice included in the income of B & C for the taxable year ended March 31, 1968, certain unreported interest income. Petitioners have disputed these adjustments. The burden of proving respondent wrong is, of course, on the petitioners. The only "evidence" presented by petitioners was the conclusions of their accountant, Harold *244 Greenband. His statements are of no weight, inasmuch as they are merely "contentions" of what he thinks should be done in this case. Further, nothing other than his bare testimony exists in this case--no documentary evidence was ever produced. Petitioners have not met their burden of proof. The respondent's determination of these adjustments is sustained. Issue 6. Whether B & C Machine Co., Inc. should be allowed to shift $59,566.95 of income from fiscal year 1968 to fiscal year 1969 in order to reconcile differences in its books and records.
This issue was raised by petitioners at trial and does not appear in the notice of deficiency. Petitioners contend that approximately $60,000 was "erroneously" reported as taxable income on B & C's return for the fiscal year ended March 31, 1968, rather than "correctly" reported as taxable income on B & C's return for the fiscal year ended March 31, 1969. No evidence was ever produced for this contention except Exhibit 64 and the conclusions of B & C's accountant, Harold Greenband. Such "evidence" is of little value. Exhibit 64 was not admitted to show the truth of the matters asserted therein. Further, the cited portions *245 of the transcript contain merely Greenband's recitation of what is in Exhibit 64 and his "contention" that he is correct. Neither Exhibit 64 nor Greenband's testimony about that exhibit was offered to prove the truth of the matters contained therein--that was to be proved by the testimony of other witnesses. Further, the testimony was unsupported by any documentary evidence. Since the original materials upon which Exhibit 64 and Greenband's testimony were allegedly based were not in the courtroom, respondent was not offered an adequate opportunity to cross-examine. Petitioners have not met their burden of proof. Decisions will be entered under Rule 155.* Footnotes
1. Cases of the following petitioners are consolidated herewith: Wallace E. Qualey, docket No. 6047-73; B & C Machine Co., Inc., a California corporation, docket No. 6048-73; and Allan S. Qualley and Maxine, C. Qualley, docket No. 6049-73.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
3. At trial counsel for petitioners explained that Wallace E. Qualey had changed the spelling of his last name for phonetic reasons.↩
4. S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922↩, 1009.
5. J. D. & A. B. Spreckels Co.,41 B.T.A. 370 (1940); Naeter Brothers Publishing Co.,42 T.C. 1 (1964); Elko Realty Co.,29 T.C. 1012 (1958), affd. per curiam 260 F.2d 949 (3d Cir. 1958); R. P. Collins & Co. v. United States,303 F.2d 142 (1st Cir. 1962); Hawaiian Trust Co., Ltd. v. United States,291 F.2d 761↩ (9th Cir. 1961).
6. Section 269(a)↩ disallows loss deductions where "persons acquire * * * directly or indirectly, control of a corporation * * * and the principal purpose * * * is evasion or avoidance of Federal income tax * * *."
7. Arcade Realty Co.,supra↩ at p. 264.
8. The state court's judgments and findings of fact were entered pursuant to settlement agreements between the parties.↩
9. The government argues that B & C has not shown that it is the entity properly entitled to deduct said alleged losses.↩