MICHAEL G. JOLIN and SUSAN P. JOLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CHARLES F. WITTE and PATRICIA G. WITTE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jolin v. Commissioner
Docket Nos. 25480-82, 25690-82.
United States Tax Court
T.C. Memo 1985-287; 1985 Tax Ct. Memo LEXIS 342; 50 T.C.M. (CCH) 140; T.C.M. (RIA) 85287; June 17, 1985. Bruce W. Powell,H. Thompson Nicholas, Jr., and Bertrand M. Harding, Jr. for the petitioners. Nancy B. Herbert, for the respondent. COHEN MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined deficiencies in Federal income *345 tax for the calendar year 1978 of $164,729.96 for Michael G. Jolin and Susan P. Jolin and $159,615.52 for Charles F. Witte and Patricia G. Witte. After concessions, the issues for decision are: (1) whether Builder's Service Group of Ohio, Inc. was general partner of certain limited partnerships, and if so, whether it was required to include in income certain guaranteed payments that were accrued by the partnerships; (2) whether Builder's Service Group of Ohio, Inc. had more than one class of stock within the meaning of section 1371(a)(4), [1] or was a member of an affiliated group within the meaning of section 1504, thereby terminating its status as a small business corporation; and (3) the extent of petitioners' ownership in Builder's Service Group of Ohio, Inc. as of June 30, 1978. Some of the facts have been stipulated and are so found. The stipulations of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. After initially stating *346 some undisputed background facts, we combine our findings of fact and opinion with respect to each issue. Petitioners Michael G. Jolin (Jolin) and his wife, Susan P. Jolin, and Charles F. Witte (Witte) and his wife, Patricia G. Witte, resided in Ohio at the time their petitions were filed herein. Each couple filed joint Federal income tax returns for the year in issue with the Cincinnati Service Center, Covington, Kentucky. Jolin and Witte formed Builder's Service Group of Ohio, Inc. (BSG of Ohio) on or about September 30, 1976. BSG of Ohio was engaged in the business of real estate development, including the construction of housing projects subsidized by the United States Government through the Farmers' Home Administration (FmHA) and the United States Department of Housing and Urban Development (HUD). BSG of Ohio elected under the provisions of subchapter S of the Internal Revenue Code to be taxed as a small business corporation, reported its income on a cash basis, and adopted a fiscal year ending June 30. Builder's Service Group of West Virginia, Inc. (BSG of West Virginia) was incorporated on April 27, 1977, as a West Virginia corporation. All of its activities *347 were reported as transactions of BSG of Ohio for income tax purposes. During 1976 and 1977, Jolin and Witte were involved in the formation and syndication of four limited partnerships for the development and ownership of federally-assisted housing projects in West Virginia, Wisconsin, and Virginia: Madison, Ltd. (Madison); Romney, Ltd. (Romney); Manitowoc, Ltd. (Manitowoc); and Narrows, Ltd. (Narrows). Issue No. 1: Guaranteed Payments
FINDINGS OF FACT The prospectus for each limited partnership provided for a guaranteed payment of organizational costs to general partners that would be paid from the capital contributions of the limited partners. On their partnership returns for calendar year 1977, Madison, Romney, Manitowoc, and Narrows reported guaranteed payments to partners as follows: Amount Claimed as
Partnership
Amount Reported
Current Deduction
Madison
$102,000
$ 20,400
Romney
112,500
22,500
Manitowoc
278,400
55,680
Narrows
136,000
27,200
$628,900
$125,780
On its Form 1120S, U.S. Small Business Corporation Income Tax Return for the year ended June 30, 1978, BSG of Ohio reported syndication income of $125,780 attributable *348 to guaranteed payments from the four limited partnerships. The prospectus for each limited partnership indicated that BSG of Ohio would be the contractor for the project. Each prospectus further provided that: "[t]he Partnership will obtain construction and permanent financing. * * * The Partnership will arrange with Builder's Service Group of Ohio, Inc. to be responsible for the construction of the Project for the Partnership. Pursuant thereto, Builder's Service Group of Ohio, Inc. will provide a guarantee to the Partnership to guarantee the completion of the Project in full compliance with all financing and FmHA [or HUD] requirements." Each prospectus indicated that "[t]he Limited Partners will make a substantial investment in the Partnership prior to completion of the Project construction." The subscription agreements executed by the investors for the acquisition of units in each limited partnership contained the following provision: In the event that the undersigned fails to pay any installment of the Promissory Note on or before the due date thereof, he hereby agrees that he will be in default under the terms of this Subscription Agreement, the Promissory *349 Note and the Agreement (as the same may be amended). In the event of such default, the Managing General Partner shall serve written notice of such default upon the undersigned, and if he fails to pay the installment within fifteen (15) days after the notice is delivered or mailed to him by certified mail, the Managing General Partner may elect to cause a forfeiture of all of his limited partnership interests and rights, which forfeiture shall inure to the benefit of the Managing General Partner. Thereafter, the Managing General Partner shall be a limited partner having a limited partnership interest equal to the limited partnership interest of the undersigned, and the Managing General Partner shall be required to contribute (in accordance with the terms of the Promissory Note) to the Partnership the amount owed by the undersigned. Of the four projects, only that proposed to be constructed by Madison was completed. Each limited partnership reported its income on a calendar year basis and used an accrual method of accounting. The specific organizational provisions and actual transactions of each limited partnership were as follows: Madison
Madison was formed *350 on or about December 17, 1976, [2] for the construction of a 24-unit apartment complex in Madison, West Virginia. The prospectus proposed the sale to investors meeting certain financial qualifications of 120 units for $120,000, with a minimum purchase of $10,000 (10 units). According to the prospectus, the offering would be underwritten by Ohio State Planning, Inc. for a commission of $1,500 per ten units. The prospectus provided for a capital contribution by the general partners of $30,500, and a guaranteed payment to general partners of $102,000 to be paid from the capital contributions of the limited partners. According to the prospectus and the Amended Limited Partnership Agreement dated April 26, 1977, Witte and BSG of West Virginia would be the general partners, and BSG of West Virginia would serve as the managing general partner. The prospectus indicated that the partnership would obtain construction and permanent financing of $414,300. As *351 proposed, the project would be financed through the FmHA Section 515 Rural Rental Housing Program, which provided for direct permanent mortgage loans at market interest rates. According to the prospectus, this program provided for monthly subsidy payments as a credit for mortgage payments on behalf of the project's owners and required the owners to pass along the benefits of this "interest credit" to eligible tenants in the form of lower rents. In October and November 1977, subscription agreements and promissory notes were executed by the following individuals for the acquisition of the 120 units in Madison: Number of Limited
Limited Partners
Partnership Units
Amount
Marvin Bryant
10 units
$ 10,000
James and Audra Black
20 units
20,000
Daniel S. Grayson
20 units
20,000
James McElroy
20 units
20,000
James E. Kempe
50 units
50,000
Total
120 units
$120,000
Each individual investor paid 20 percent of the amount due upon execution of the subscription agreement. The balance, without interest, was payable over a 4-year period under the terms of each promissory note. As of December 1977, $24,000 of the $120,000 due the partnership *352 had been paid; additional amounts of $14,000, $8,000, and $13,000 were paid as of June 1978, November 1978, and January 1979, respectively. On its Form 1065, U.S. Partnership Return of Income, for 1977, signed by Jolin or an individual authorized to sign on his behalf, Madison reported guaranteed payments to general partners of $102,000, of which $20,400 was deducted by the partnership. A Schedule K-1 was filed with the 1977 return showing BSG of West Virginia as a general partner of Madison and the tax identification number of BSG of Ohio as the partner's identifying number. On its 1978 return, Madison deducted guaranteed payments of $20,400. A Schedule K-1 was filed with the 1978 return showing BSG of West Virginia as a general partner and the tax identification number of BSG of Ohio as the partner's identifying number. Romney
Romney was formed in December 1976 for the development of a 36-unit apartment complex in Romney, West Virginia. The prospectus proposed the sale to qualified investors of $180,000 of limited partnership interests at $1,000 per unit, with a minimum purchase of $22,500 (22-1/2 units). The prospectus provided for a capital contribution *353 by the general partners of $46,338, and a guaranteed payment to general partners of $180,000 to be paid from the capital contributions of the limited partners. BSG of West Virginia and Witte were designated by the prospectus as general partners, and BSG of West Virginia was named as managing general partner. The Limited Partnership Certificate for Romney, dated September 1, 1977, filed with the Hampshire County Court, West Virginia, and recorded in the General Records of Hampshire County, West Virginia, indicated that BSG of West Virginia and Jolin were general partners. The parties have stipulated, however, that during the taxable years 1977 and 1978, BSG of Ohio was a general partner in Romney. The prospectus indicated that the partnership would obtain construction and permanent financing of $633,600. As proposed, the project would be financed through the FmHA Section 515 Rural Rental Housing Program. By subscription agreements and promissory notes dated December 30, 1977, six individuals acquired limited partnership interests in Romney as follows: Number of Limited
Limited Partners
Partnership Units
Amount
Carl J. Monastra
11-1/4 units
$ 11,250
Vincent M. Panichi
11-1/4 units
11,250
Frederick T. Forster
22-1/2 units
22,500
Phillip G. Fankhauser
22-1/2 units
22,500
James J. Hamman
22-1/2 units
22,500
James A. McElroy
22-1/2 units
22,500
Total
112-1/2 units
$112,500
*354 The subscription agreements were accepted by Jolin on behalf of BSG of West Virginia as managing general partner. Each individual investor paid 10 percent of the amount due upon execution of the subscription agreement. The balance, without interest, was payable over a 4-year period under the terms of each promissory note. As of December 1977, $11,250 of the $180,000 due the partnership had been paid; additional amounts of $6,700, $3,375, $1,125, and $4,500 were paid as of January 1978, April 1978, May 1978, and July 1978, respectively. On its Form 1065 for 1977, signed by Jolin or an individual authorized to sign on his behalf, Romney reported guaranteed payments to general partners of $112,500, of which $22,500 was deducted by the partnership. A Schedule K-1 was filed with the 1977 return showing BSG of West Virginia as a general partner and the tax identification number of BSG of Ohio as the partner's identifying number. On its 1978 return, Romney deducted guaranteed payments of $22,500. A Schedule K-1 was filed with the 1978 return showing BSG of West Virginia as a general partner and the tax identification number of BSG of Ohio as the partner's identifying *355 number. Manitowoc
Manitowoc was formed on or about January 15, 1977, for the construction of a 48-unit apartment complex in Manitowoc, Wisconsin.The prospectus proposed the sale to qualified investors of $278,400 of limited partnership interests at $10,000 per 10 units, with a minimum purchase of $34,800 (34.8 units). The prospectus provided for a capital contribution by the general partners of $169,533, and a guaranteed payment to general partners of $278,400 to be paid from the capital contributions of the limited partners. According to the prospectus, BSG of Ohio and Witte would be the general partners, and BSG of Ohio would serve as managing general partner. Under Manitowoc's Amended Limited Partnership Agreement, BSG of Ohio and Jolin were the general partners and Witte was the original limited partner. The amended agreement prohibited the admission of additional general partners. The Amended Limited Partnership Certificate for Manitowoc was executed on or about December 30, 1977, by Jolin individually and as president of BSG of Ohio as general partners, and by Witte and James V. Farina (Farina) as limited partners, and filed with the Fairfield County, Ohio *356 Court. The prospectus indicated that the partnership would obtain construction and permanent financing of $1,015,600. As proposed, the project would be financed through a program administered by HUD known as the "Section 8 Program." According to the prospectus, the Federal Government would guarantee under this program to supplement rents on behalf of tenants. The prospectus also indicated that a submission would be made to HUD for loan guarantee insurance (the 221(d)4 program). By subscription agreement and promissory note dated December 30, 1977, Farina acquired 278.4 units in Manitowoc for $278,400. By its terms, the note provided for a downpayment of $27,840 and subsequent payments of $34,800 every 6 months commencing June 15, 1978, through December 15, 1979, and $27,840 every 6 months commencing June 15, 1980, through December 15, 1981, without interest. The subscription agreement was accepted by Jolin on behalf of BSG of Ohio as managing general partner. Farina was the sole limited partner in Manitowoc as of December 30, 1977. As of December 1977, Farina had paid $27,840 of the $278,400 due the partnership; as of June 15, 1978, a total of $62,640 had been paid. No further *357 amounts were paid by Farina. A note dated December 31, 1977, was executed by Jolin on behalf of Manitowoc in amount of $278,400 payable to BSG of Ohio and Witte or order. The note provided for payments according to the following schedule: $27,840 due 12-31-77 69,600 due 12-31-78 69,600 due 12-31-79 55,680 due 12-31-80 55,680 due 12-31-81 On or about December 31, 1977, BSG of Ohio billed Manitowoc for management fees and other expenses for 1977 in the amount of $55,680. On its Form 1065 for 1977, signed by Jolin or an individual authorized to sign on his behalf, Manitowoc reported guaranteed payments of $278,400, of which $55,680 was deducted by the partnership. A Schedule K-1 was filed with the 1977 return showing BSG of Ohio as a general partner. On its 1978 return, Manitowoc reported guaranteed payments of $62,640 capitalized by the partnership. A Schedule K-1 was filed with the 1978 return showing BSG of Ohio as a general partner. Narrows
Narrows was formed on or about January 15, 1977, for the construction of a 32-unit apartment complex in Narrows, Virginia. The prospectus proposed the sale to qualified investors of $160,000 of limited partnership *358 interests at $1,000 per unit, with a minimum purchase of $10,000 (10 units). According to the prospectus, the offering would be underwritten by Ohio State Planning, Inc. for a commission of $1,500 per 10 units. The prospectus indicated that the partnership would obtain construction and permanent financing of $592,000. As proposed, the project would be financed through the FmHA Section 515 Rural Rental Housing Program. The prospectus provided for a capital contribution by the general partners of $43,620, and a guaranteed payment to general partners of $136,000 to be paid from the capital contributions of the limited partners. The prospectus was inconsistent in its designation of the general partners: In one place it named BSG of Ohio and Witte as general partners and BSG of Ohio as managing general partner; in others, BSG of West Virginia and Witte were named as general partners, with BSG of West Virginia as managing general partner. The Amended Limited Partnership Certificate for Narrows, dated December 30, 1977, and filed that same date with the Court of Fairfield County, Ohio, designated BSG of Ohio and Jolin as general partners and Witte as original limited partner. *359 The Amended Limited Partnership Certificate was executed by Jolin individually and as president of BSG of Ohio as general partner and Witte as original limited partner. By subscription agreements and promissory notes dated December 30, 1977, five individuals acquired limited partnership interests in Narrows as follows: Number of Limited
Limited Partners
Partnership Units
Amount
Anthony J. DiSanto
2 units
$ 20,000
James P. Whitney
4 units
40,000
Gene & Leontina Fatica
2 units
20,000
Robert A. Zenobi
6 units
60,000
Earl B. Willhoit
2 units
20,000
Total
16 units
$160,000
The subscription agreements were accepted by Jolin on behalf of BSG of Ohio as managing general partner. Each individual investor paid 10 percent of the amount due upon execution of the subscription agreement. The balance, without interest, was payable over a 4-year period under the terms of each promissory note. As of December 1977, $16,000 of the $160,000 due the partnership had been paid; additional amounts of $2,000, $6,000, $8,000, and $2,000 were paid as of January 1978, March 1978, May 1978, and October 1978, respectively. On its Form 1065 for 1977, *360 signed by Jolin or an individual authorized to sign on his behalf, Narrows reported guaranteed payments to general partners of $136,000, of which $27,200 was deducted by the partnership. A Schedule K-1 was filed with the 1977 return showing BSG of Ohio as a general partner. On its 1978 return, Narrows deducted guaranteed payments of $27,200. A Schedule K-1 was filed with the 1978 return showing BSG of Ohio as a general partner. ULTIMATE FINDING OF FACT As of December 31, 1977, BSG of Ohio was general partner of Madison, Romney, Manitowoc, and Narrows, and was entitled to guaranteed payments from those limited partnerships. OPINION Respondent determined that BSG of Ohio, as general partner of each limited partnership, was required under the provisions of section 707(c) [3] to include in income on its 1978 return the full amount of guaranteed payments reported by the partnerships, rather than only $125,780 taken as current deductions by the partnerships and reported on BSG of Ohio's return. *361 Petitioners contend that the guaranteed payments with respect to Madison, Narrows, and Romney were not includable in BSG of Ohio's income because BSG of West Virginia, not BSG of Ohio, was the general partner of each partnership. The parties agree that BSG of Ohio was the general partner of Manitowoc. They also stipulated that BSG of Ohio was a general partner in Romney during the taxable years 1977 and 1978. Petitioners also contend that the guaranteed payments were not properly accruable by any of the partnerships as of December 31, 1977. Petitioners therefore reason that no guaranteed payments from any of the limited partnerships were includable in BSG of Ohio's income for the year ended June 30, 1978. At the outset, we must determine whether BSG of Ohio was in fact the General partner of each of the limited partnerships as of December 31, 1977. The evidence presented by petitioners on this issue is both confused and equivocal. With respect to Narrows, the prospectus was inconsistent in the designation of general partner. The amended limited partnership certificate, filed with the Fairfield County, Ohio, Court, as well as the subscription agreements and the *362 1977 and 1978 partnership information returns, indicated that BSG of Ohio was the general partner of Narrows. Those documents were later in time than the prospectus. Thus we have found that BSG of Ohio was the general partner of Narrows. The documentary evidence introduced with respect to Romney and Madison named BSG of West Virginia as the general partner. Petitioners produced no evidence, however, of any activities conducted by BSG of West Virginia as a general partner, or otherwise. The parties stipulated that BSG of Ohio was a general partner in Romney during the years in issue. The parties also stipulated that: "Builders Service Group of West Virginia, Inc. was incorporated on April 27, 1977 as a West Virginia corporation. Thereafter, the corporation was treated as an affiliate of Builders Service Group of Ohio, Inc. and all of its activities were reported by the company accountant and income tax return preparer as transactions of Builders Service Group of Ohio, Inc. for income tax purposes." Petitioners are bound by their stipulations. Moreover, the Schedule K-1 filed with the 1977 return for each of Madison and Romney used the tax identification number *363 of BSG of Ohio as the partner's identifying number. Petitioners now seek to repudiate their previously adopted method of reporting income of the two corporations. On the record before us, we conclude that they have failed to carry their burden of proving that BSG of West Virginia rather than BSG of Ohio was the general partner of each of these limited partnerships. See Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In view of our finding that BSG of Ohio was the general partner of each of the limited partnerships, we must now determine whether the full amount of guaranteed payments reported by each of the limited partnerships in calendar year 1977 should be included in BSG of Ohio's income for the year ended June 30, 1978. Section 707(c) provides that payments to a partner for services or the use of capital, if determined without regard to the income of the partnership, are to be considered as made to one who is not a member of the partnership, but only for the purposes of including such amounts in the recipient's gross income under section 61, and, subject to section 263, for allowing the partnership *364 a business expense deduction pursuant to section 162. Petitioners do not dispute that the designated payments were "guaranteed payments" within the meaning of section 707(c). The payments were designated as such in each prospectus, as well as in petitioners' briefs and in the stipulations. The payments at issue were fixed sums determined without regard to partnership income payable to the partners for their services in their capacities as partners, and as such were guaranteed payments within the meaning of section 707(c). [4]
Petitioners take the position that section 1.707-1(c), Income Tax Regs., limits the inclusion of section 707(c) guaranteed payments by cash basis partners to situations where such payments are in fact deductible by the partnership. Petitioners dispute the fairness of requiring cash basis partners to include in income guaranteed payments that have been accrued as capital items by an accrual *365 basis partnership when the partnership has received no reciprocal tax deduction. The timing of the inclusion required by section 707(c) is set forth in section 706(a), which provides: (a) Year in Which Partnership Income is Includible.--In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner. The timing question is also specifically addressed in section 1.707-1(c), Income Tax Regs., as follows: (c) Guaranteed payments. Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See *366 section 706(a) and paragraph (a) of sec. 1.706-1. * * * In Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976), we held that includability of a guaranteed payment in a recipient partner's income does not necessarily insure deductibility at the partnership level. We considered the legislative history of section 707(c) and concluded: We think that all Congress meant was that guaranteed payments should be included in the recipient partner's income in the partnership taxable year ending with or within which the partner's taxable year ends and in which the tax accounting treatment of the transaction is determined at the partnership level. S. Rept. No. 1622, supra, at pp. 94, 385, 387. Congress was thus only applying, for this particular purpose, the aggregate rather than the entity approach to the question of the timing of inclusion in the recipient partner's income of section 707(c) payments. [63 T.C. at 95.] Thus the tax accounting treatment of the transaction is determined at the partnership level regardless of the recipient partner's method of accounting.S. Rept. No. 1622, to accompany *367 H.R. 8300 (Pub. L. No. 591) 83d Cong., 2d Sess. 94, 385, 387 (1954). A partner may not defer inclusion of any portion of a guaranteed payment simply because the partnership must capitalize the expense that it paid or accrued. Any unfairness that results from taxing a partner on guaranteed payments that he neither receives nor benefits from via a tax deduction at the partnership level is a consequence of the taxpayer's choice to do business in the partnership form. See Pratt v. Commissioner,64 T.C. 203, 213 (1975), affd. on this point and revd. on other grounds 550 F.2d 1023 (5th Cir. 1977); [5] S. Rept. No. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49 at 130-133. See also W. McKee, W. Nelson and R. Whitmire, Federal Taxation of Partnerships and Partners, par. 13.03[4], pp. 13-21 - 13-23 (1977). Petitioners' primary argument, however, is that the guaranteed payments were not properly accruable on December 31, 1977, and, therefore, were not includible in BSG of Ohio's income for the year ended June 30, 1978. The parties have stipulated that each limited partnership *368 adopted an accrual method of accounting. Under the accrual method, deductions are taken in the year in which all events have occurred to determine the fact of liability and the amount can be determined with reasonable accuracy. Section 1.461-1(a)(2), Income Tax Regs. In Burlington Northern Railroad Co. v. Commissioner,82 T.C. 143 (1984), on appeal (8th Cir., April 30, 1985), we described the two-pronged "all events" test as follows: First, all events that determine the fact of liability must have occurred as of the end of the year for which petitioner seeks to accrue the liability. This requirement prevents the deduction of an expenditure that might never be made. The second requirement is that as of the end of the year for which petitioner seeks to accrue the liability, petitioner must be able to estimate with reasonable accuracy the amount of the expenditure to be made in the subsequent year. * * * [82 T.C. at 147. Citations omitted.] [6]
Petitioners have failed to prove that the guaranteed payments were not properly accruable as of December 31, 1977.
*369 As of December 31, 1977, each of the limited partnerships was fully syndicated and each limited partner had executed a subscription agreement and promissory note for the purchase of a limited partnership interest. Also as of that date, each limited partner had paid the downpayment required under the terms of the subscription agreement and promissory note. On its Form 1065 for the calendar year 1977, each limited partnership reported the full amount of the guaranteed payment due the general partner and took 20 percent of that amount as a current deduction. Jolin testified that each of these returns was signed by him or by an individual authorized to sign on his behalf. Petitioners now contend that the general partner was not entitled to receive the guaranteed payments until the project was financed and/or completed. Petitioners allege that the guaranteed payments described in each prospectus presupposed Federal funding, which had not been secured as of December 31, 1977. Petitioners rely on the following language contained in each prospectus: "[t]he Partnership will obtain construction and permanent financing. * * * The Partnership will arrange with Builder's *370 Service Group of Ohio, Inc. to be responsible for the construction of the Project for the Partnership. Pursuant thereto, Builder's Service Group of Ohio, Inc. will provide a guarantee to the Partnership to guarantee the completion of the Project in full compliance with all financing and FmHA [or HUD] requirements." Petitioners' argument that the partnerships had no enforceable claim against the limited partners for the balance of unpaid subscriptions because of the partnerships' failure to procure financing as of December 31, 1977, must be rejected. Each prospectus explicitly provided that the anticipated source for the guaranteed payment would be the contributions of limited partners. Each prospectus also advised potential investors that the limited partners would make a substantial investment in the partnership prior to completion of the construction of a project. The subscription agreements and promissory notes executed by the limited partners contained no language that would relieve a limited partner of his or her obligation for the balance of the unpaid subscription. Upon default, a forfeiture would inure to the benefit of the managing general partner. There is no evidence *371 that the limited partners were unable to meet their obligations under the terms of the subscription agreements and promissory notes. On the record before us, we cannot conclude that as of December 31, 1977, all events had not occurred to determine the liability for payment of the guaranteed payments to BSG of Ohio as general partner of each of the four limited partnerships. Accordingly, we have no ground for negating the treatment reported on the 1977 partnership returns, which were within the control of petitioner Jolin. We therefore hold that BSG of Ohio was required under the provisions of section 707(c) to include in income the full amount of guaranteed payments due to it from the four partnerships. Issue 2: Status as a Small Business Corporation
FINDINGS OF FACT At the time of the election on September 30, 1976, to be taxed as a small business corporation, BSG of Ohio had one class of stock. Jolin and Witte each owned one-half of its 200 outstanding shares. In early 1977, Jolin contacted Carl J. Monastra (Monastra), a Certified Public Accountant, in an effort to raise investment capital to cover anticipated overhead expenses during loan processing in *372 connection with certain projects. Jolin proposed that Monastra and Earl B. Willhoit (Willhoit), a dentist and friend of Monastra, invest in 400 units at $400 per unit. On or about May 21, 1977, a "Joint Venture Agreement" was entered into among Willhoit, Monastra, Jolin, Witte, and BSG of Ohio.Under the terms of the document, the parties agreed: 1. To fund Builder's Service Group of Ohio, Inc., a Sub Chapter S corporation, at the rate of $10,000 per month, beginning April 20, 1977. 2. Witte and Jolin will, and either Willhoit or Monastra, may serve as directors, at their option. 3. Mike Jolin will serve as President and Executive Officer. 4. Charles Witte will serve as Chairman of the Board. 5. Carl Monastra, C.P.A. may supervise accounting at his option. 6. Profits, of whatever source, will be divided three ways, according to 1/3 share ownership. 7. Witte and Jolin will serve as individual general partners. Monastra and Willhoit will serve as limited. 8. Willhoit and Monastra, together, will join Jolin and Witte with supporting financial statements for credit on non-liability mortgage loans and credit during construction. 9. Willhoit will familiarize *373 himself further and constantly in the matter of tax shelter and assist in placing same advantageously to Company. * * * 14. Individuals may request division of profits and/or residuals in kind, and this request will be honored by the Board if no undue cost or tax burden is placed on corporation. 15. It is understood Builder's Service Group of Ohio, Inc. will submit applications at a rate sufficient to buring the level of operation up to 400 units per year. Beyond that number, contracts with outsiders will be considered for overhead funding and provisions of added financial statements. 16. This joint venture can be terminated at any time by any party, on 90 days' notice to other parties accompanied by an offer to buy or sell at same price and terms, option to choose alternative to be chosen by the party to whom the notice is given. * * * 18. Transfer of shares on corporate records to accomplish share division will be completed promptly upon the signing hereof. 19. It is understood projects in other states require separate corporations to satisfy lenders and 1/3 shares will be established in those corporations as well as in Builders Service Group of Ohio, *374 Inc. will be transferred to Willhoit and Monastra. The agreement further provided "that of the $160,000 committed, $80,000 will come out of the mortgage loans. They will be repaid at construction closings. The $160,000 figure is for cash flow assurances for sound operation." Monastra and Willhoit raised the funds contemplated under the Joint Venture Agreement by organizing a group of 10 investors, including themselves, known as "Buckeye Investors." Buckeye Investors advanced a total of $160,000 to BSG of Ohio, at $10,000 for 16 months. The investment by Buckeye Investors carried no interest. Buckeye Investors would be entitled to a one-third share in the profits of the construction and syndication of 400 units upon completion of the projects. On its Form 1120S, U.S. Small Business Corporation Income Tax Returns for 1977 and 1978, BSG of Ohio reported that, at the end of each taxable year, it did not own, directly or indirectly, 50 percent or more of the voting stock of a domestic corporation, and that it was not a member of a controlled group subject to the provisions of section 1561. Respondent determined that Jolin and Witte were each 50 percent shareholders *375 in BSG of Ohio, a subchapter S corporation, and, accordingly, Jolin and Witte had a distributive share of income from the corporation of $271.994.50 and $271,994.41, respectively, which was includable in income for the calendar year 1978. ULTIMATE FINDING OF FACT During the year ended June 30, 1978, BSG of Ohio was a valid small business corporation. OPINION Petitioners contend that BSG of Ohio's election to be treated as a small business corporation was terminated by the corporation's failure to continue to satisfy all of the qualification requirements set forth in subchapter S. [7]
Section 1372(e)(3) provides for the termination of an election made by an electing small business corporation under section 1372(a) if at any time the corporation ceases to be an electing small business corporation as defined in section 1371(a). [8] Section 1371(a) defines a small business corporation in part as a corporation with no more than one class of stock. Specifically excluded from the definition are those corporations that are members of an affiliated group as defined in section 1504. *376 Petitioners contend that BSG of Ohio's election under section 1372(a) terminated automatically because the corporation had more than one class of stock and was a member of an affiliated group. (1) Whether BSG of Ohio issued more than one class of stock
Petitioners contend that the investment by the Buckeye Investors constituted a second class of stock so as to terminate BSG of Ohio's subchapter S election. A second class of stock exists in a small business corporation if the outstanding shares are not identical with respect to the rights and interests they convey in the "control, profits, and assets" of the corporation. Section 1.1371-1(g), Income Tax Regs. The one-class-of-stock limitation was enacted to avoid complexities in taxing income to shareholders with different preferences as to the distribution of profits. See Parker Oil Co. v. Commissioner,58 T.C. 985, 990 (1972). Testimony was presented that after the execution of the joint venture agreement, Buckeye Investors was organized to invest $10,000 per month for 16 months in BSG of Ohio. Monastra testified that the Buckeye Investors group was to share in one-third of the profits *377 upon completion of the construction of 400 units. Monastra testified that there was no arrangement for a preference on the return of their investment, which carried no interest, and that none of the money was returned to the investors. Jolin testified that the Buckeye Investors were entitled to all profits up to $400 per unit on the first 400 units syndicated and thereafter to one-third of the profits on the 400 units. Petitioners presented no evidence of the issuance of shares of stock or any other instruments to any of the Buckeye Investors, or that the purported arrangement varied the rights, preferences or privileges of the outstanding shareholders. Petitioners have failed to show that the purported investment by the Buckeye Investors gave the investors any rights usually attributed to stock ownership. Other than Monastra, no member of Buckeye Investors was called to testify, although petitioners initially indicated that they intended to call at least one of these individuals as a witness. There is simply not enough information in the record to enable us to determine whether the advances by the Buckeye Investors were in the nature of loans or equity interests in *378 the corporation. See Portage Plastics Co. v. United States,486 F.2d 632 (7th Cir. 1973); Amory Cotton Oil Co. v. United States,468 F.2d 1046 (5th Cir. 1972); Shores Realty Co. v. United States,468 F.2d 572 (5th Cir. 1972). We are thus unable to conclude that BSG of Ohio had more than one class of stock. (2) Whether BSG of Ohio was a Member of an Affiliated Group
Petitioners argue that BSG of Ohio's consolidation of its income with that of BSG of West Virginia for income tax purposes made it a member of an affiliated group. Petitioners reason that because the two corporations were treated as affiliated corporations through their consolidation of income on BSG of Ohio's 1978 Form 1120S, such affiliation caused BSG of Ohio to lose its status as a subchapter S corporation. Only members of an affiliated group of corporations are entitled to the privilege of making a consolidated return. Section 1501. Section 1504(a) defines the term affiliated group in part as "one or more chains of includable corporations connected through stock ownership with a common parent corporation." [9]
*379 Petitioners argument is inapposite to this case, inasmuch as the record contains no evidence of a connection between BSG of Ohio and BSG of West Virginia through stock ownership of a common parent. BSG of Ohio reported on its Federal income tax returns for 1977 and 1978 that it did not own 50 percent or more of the voting stock of any domestic corporation, either directly or indirectly. There has been no showing that BSG of West Virginia ever issued any stock. Because of the lack of a common parent corporation, BSG of Ohio and BSG of West Virginia were neither "affiliated" within the meaning of section 1504, nor entitled to file consolidated returns. See Ray Engineering Co. v. Commissioner,42 T.C. 1120, 1122 (1964), affd. per curiam 347 F.2d 716 (3d Cir. 1965). [10] Accordingly, we conclude that the subchapter S status of BSG of Ohio did not terminate prior to June 30, 1978. Issue No. 3: Stock Ownership in *380 BSG of Ohio
FINDINGS OF FACT Subsequent to the execution of the Joint Venture Agreement dated May 21, 1977, a document entitled "Amendment" was executed on or about June 1, 1977, by Witte as chairman of the board of directors and by Jolin as president of BSG of Ohio, which provided: (As per Article 7, amendments of By Laws quota regulations of Builder's Service Group of Ohio, Inc., September 28, 1976.) On this date, June 1, 1977, the Board of Directors agreed to transfer one-third of the shares of Builder's Service Group of Ohio, Inc. to Mr. Earl Willhoit and Mr. Carl Monastra, thus giving each of the two men an undivided 1/2 interest in one-third of the shares of the corporation. Charles Witte is to retain one-third of the shares of the corporation. Michael G. Jolin is to retain one-third of the shares of the corporation. Personal financial statements purportedly prepared as of December 31, 1977, were signed by Jolin and Witte and indicated that each of them had a one-third interest in BSG of Ohio. On or about March 16, 1979, Monastra and Willhoit acquired 100 percent of the equity in BSG of Ohio and BSG of West Virginia under an "Agreement, General Assignment and *381 Bill of Sale" dated March 1, 1979. The Agreement contained the following language: Whereas, Jolin and Witte each owns one-third (1/3) of the equity, common stock or otherwise, in each of BS-Ohio and BS-WVa; Whereas, Jolin and Witte hereby affirm their prior transfer of the remaining one-third (1/3) of such equity in each of BS-Ohio and BS-WVa to Monastra and Willhoit; Whereas, Jolin and Witte have agreed to transfer all such remaining equity which they own in BS-Ohio and BS-WVa to Monastra and Willhoit; A delinquent Form 1120S U.S. Small Business Corporation Income Tax Return, for BSG of Ohio for the year ended June 30, 1978, was signed on or about June 7, 1979, by Monastra as preparer, and filed in June 1979. On the return, BSG of Ohio reported as income syndication fees of $129,238.91, including fees from partnerships as follows: Madison, Ltd.
$ 20,400
Manitowoc, Ltd.
55,680
Narrows, Ltd.
27,200
Romney, Ltd.
22,500
$125,780
A Schedule K-1 was filed with the return reporting undistributed taxable income of $20,434.41 for each of Jolin and Witte as holders of 100 shares of the corporation's outstanding stock. On September 29, 1980, a *382 Form 4605, Audit Changes was executed by Monastra as an authorized officer of BSG of Ohio, whereby Monastra accepted the adjustments of respondent's examining agent to include additional syndication income of $503,120 in BSG of Ohio's income for the year ended June 30, 1978. On a delinquent Form 1120S, U.S. Small Business Corporation Income Tax Return, for the year ended June 30, 1977, signed by Monastra on October 30, 1980, BSG of Ohio reported a loss of $42,312.94. According to the Schedules K-1 filed with the return, shareholders Witte and Jolin were each entitled to one-half of the loss. On their joint return for 1977, the Wittes reported a loss from GSG of Ohio of $21,156.11. The return was signed by petitioners on or about May 15, 1978. On their joint return for 1978, the Wittes included in income the sum of $20,434.41 from BSG of Ohio. The Jolins did not report any income or loss from BSG of Ohio on their 1978 joint return. By letter to the District Director, Cincinnati, Ohio, dated January 15, 1982, the Wittes objected to the adjustment resulting from respondent's examination and the audit changes previously accepted by Monastra. In that letter, under *383 penalty of perjury, petitioners stated as follows: 6) * * *. During the year involved I, Charles F. Witte, owned 50% of the capital stock of the corporation. The tax return was prepared by the firm of Monastra Ciuni & Panichi, Certified Public Accountants. At the time of the audit, however, control of the corporation and its records had shifted to Carl Monastra of the accounting firm mentioned above. I feel that even though he signed the audit report, he had little interest in the outcome of the audit since it did not affect him. In other words, as owner of 50% of the corporation, I do not accept the examining officer's adjustment. The partnerships paid to the corporation the amounts as reported in the tax return. There were no other payments on the installment notes involved and there never will be. It is my understanding that the partnerships involved have been dissolved. 7) The examining agent's report cites Sec. 707-C of the Code. Sec. 707-C of the Code clearly applies only to payments actually received. Since the corporation has not received the amounts in the examiner's adjustment, I do not own any tax on it. ULTIMATE FINDING OF FACT As of June 30, 1978, Jolin *384 and Witte each owned 50 percent of the stock of BSG of Ohio. OPINION Under section 1372(b)(1), a subchapter S corporation generally is not subject to the corporate income tax; rather, under section 1373(a) the corporation's income is taxed to the shareholders. Having determined that BSG of Ohio was a small business corporation as of June 30, 1978, and that it was required, as general partner of each of Madison, Romney, Narrows, and Manitowoc, to include in income the full amount of guaranteed payments due from each partnership, we must now decide whether Jolin and Witte each owned one-half of the stock as of that date as determined by respondent, or only one-third as contended by petitioners. In support of their position that Monastra and Willhoit acquired a one-third interest in the stock of BSG of Ohio prior to June 30, 1978, petitioners introduced the 1977 joint venture agreement, which contained the following provision: 18. Transfer of shares on corporate records to accomplish share division will be completed promptly upon the signing hereof. Petitioners also introduced the following resolution of the board of directors: On this date, June 1, 1977, the *385 Board of Directors agreed to transfer one-third of the shares of Builder's Service Group of Ohio, Inc. to Mr. Earl Willhoit and Mr. Carl Monastra, Thus giving each of the two men an Undivided 1/2 interest in one-third of the shares of the corporation. Charles Witte is to retain one-third of the shares of the corporation. Michael G. Jolin is to retain one-third of the shares of the corporation. In addition to their own testimony as to their stock ownership, petitioners introduced the testimony of their former employee Karen Habersack (Habersack) as to the extent of the power and control exercised by Willhoit and Monastra over the corporation. No stock book, minute book, share certificate, or other corporate records were produced, however, to establish that the contemplated transfer was effected as of June 30, 1978. Petitioners also introduced two financial statements, purportedly prepared as of December 31, 1977, showing that Jolin and Witte each had a one-third interest in BSG of Ohio. Jolin and Witte both testified that these documents were prepared for submission with the FmHA and HUD loan applications. Witte's testimony at trial that his stock interest in BSG of Ohio *386 as of June 30, 1978, was limited to a one-third interest is inconsistent, however, with his other actions in connection with the extent of his stock ownership in BSG of Ohio. The Wittes' 1977 and 1978 Federal income tax returns reflect the position that Witte owned one-half of the corporation's stock. Witte also asserted that he owned one-half of the stock as of June 30, 1978, in his petition filed in these proceedings, as well as in the letter dated January 15, 1982, to the Internal Revenue Service. Monastra testified that neither he nor Willhoit had an interest as shareholders in BSG of Ohio until March 1979. His testimony is consistent with the treatment on the 1978 corporate income tax returns for BSG of Ohio, which he prepared. Although we recognize that the interest of Monastra is adverse to that of petitioners, after carefully examining all of the evidence before us, we are unable to conclude that petitioners have satisfied their burden of proving that there was an effective transfer to Willhoit and Monastra of a one-third interest in BSG of Ohio as of June 30, 1978. Accordingly, we hold that respondent's determination is correct. Conclusion
Although *387 we are sympathetic to petitioners' situation, we cannot now alter the structure of the transactions at issue. The principle we applied in Cornelius v. Commissioner,58 T.C. 417 (1972), affd. 494 F.2d 465 (5th Cir. 1974), also in the context of subchapter S. applies with equal force here: "[a] taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form." 58 T.C. at 422, quoting Legg v. Commissioner,57 T.C. 164, 169 (1971), affd. 496 F.2d 1179 (9th Cir. 1974). Similarly, unimplemented intentions cannot be recognized merely because of belated discovery of the consequences of failure to follow through with contractual formalities. We have considered other arguments advanced by petitioners and found them to be unpersuasive. Decisions will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Our findings as to the date of formation of each partnership are in accordance with the stipulations of the parties although the dates in the stipulations are not necessarily consistent with all of the evidence in the record.↩
3. SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP. * * * (c) Guaranteed Payments.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).↩
4. Although the evidence does not specify the services to be rendered by the general partner in return for the guaranteed payments, nor when the services are to be rendered, each prospectus refers to the guaranteed payments in connection with organizational costs.↩
5. See also Gaines v. Commissioner,T.C. Memo. 1982-731↩.
6. Congress added sec. 461(h) in the Tax Reform Act of 1984, Pub. L. 98-369, sec. 91(a), 98 Stat. 494, 598, to provide that for amounts after July 18, 1984, the all-events test will not be satisfied for an accrual-basis taxpayer until "economic performance" has occurred.↩
7. The Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, substantially revised the provisions of subchapter S. That Act has no application, however, to the year before us. ↩
8. Section 1371(a) in effect during the year in issue provided: SEC. 1371. DEFINITIONS. (a) Small Business Corporation.--For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not-- (1) have nore than 15 shareholders; (2) have as a shareholder a person (other than an estate and other than a trust described in subsection (e)) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock.↩
9. Section 1504(a) for the year in issue provided in pertinent part: SEC. 1504. DEFINITIONS. (a) Definition of "Affiliated Group".--As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if-- (1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and (2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations.↩
10. Section 1504 prescribes no test of affiliation other than stock ownership.See Qualley v. Commissioner,T.C. Memo. 1976-208, quoting Fox v. Commissioner,T.C. Memo. 1958-205↩.